UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENEVIEVE PETERS SCOTT,

        Plaintiff,

v.

                                           Case No. 26-cv-11142
                                           Honorable Linda V. Parker
JOCEYLYN BENSON, in her official
capacity as Secretary of the State of
Michigan; DANA NESSEL, in her official
capacity as Attorney General of Michigan; and
JONATHAN BRATER, in his official
capacity as Director of the Michigan
Bureau of Elections,

        Defendant.
_____/

**<u>OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION (ECF NO. 3)</u>**

Plaintiff Genevieve Peters Scott wants to appear on Michigan's ballot for the

August 4, 2026 primary election, to be considered as the Republican Party's

nominee for United States Senate.  Peters Scott has not collected the number of

voter signatures required under Michigan law to qualify, however.  Claiming that

Michigan's "statutory scheme" to qualify for inclusion on the ballot violates her

rights under the First and Fourteenth Amendments to the United States

Constitution, she filed this pro se action on April 7, 2026, naming as Defendants

Michigan Secretary of State Jocelyn Benson, Michigan Attorney General Dana Nessel, and Director of the Michigan Bureau of Elections Jonathan Brater.

On the same date, Peters Scott also filed a motion for a temporary restraining order ("TRO") and preliminary injunction. (ECF No. 3.)  In the motion, Peters Scott asks the Court to enjoin Defendants from enforcing the signature requirement and order them to place her name on the August 4, 2026 primary ballot.  Alternatively, she asks the Court to set a reduced signature threshold or a reasonable filing fee to qualify.  The motion is fully briefed.  (ECF Nos. 8, 9.)  Finding the facts and legal arguments adequately presented in the parties' filings, the Court is dispensing with oral argument with respect to the motion.  *See* E.D. Mich. LR 7.1(f).  Concluding that Michigan's signature requirement is constitutional, the Court is denying Peters Scott's request for injunctive relief.

## I.      Standard of Review

Whether a party is moving for a TRO or preliminary injunction, the district court considers the same four factors: (1) the likelihood of success on  the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4)  the impact on the public interest.  *N.E. Ohio Coal. for Homeless & Serv. Emp. Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).  "These factors are not prerequisites that must be

met, but are interrelated considerations that must be balanced together." *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (quoting *Mich. Coal. of Radioactive Materials Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

A TRO or preliminary injunction "is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)).  Because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[,]" . . . a preliminary injunction is customarily granted on the basis of procedures less formal and evidence less complete than in a trial on the merits." *Univ. of Tx. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Fetch! Pet Care, Inc. v. Atomic Pawz, Inc.*, 170 F.4th 546, 554 (6th Cir. 2026) (citations omitted).  The party moving for the injunction has the burden to show that the circumstances clearly demand it.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Although the district court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 223 F.3d 620, 625 (6th Cir. 2000).  Thus, the court is not required to make specific findings

3

concerning each of the four factors if fewer factors are dispositive. *In re DeLoreon Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

## II.   Factual Background

### A.   Peters Scott's Campaign

Peters Scott is seeking the Republican nomination for United States Senate in Michigan's August 4, 2026 primary election. (ECF No. 3 at PageID.31 ¶ 3.) She organized a statewide volunteer system, including regional directors and teams of volunteers, to assist in collecting the signatures necessary to be included on the ballot. (*Id.* ¶ 10.) She has more than 230 volunteers. (*Id.*)

Peters Scott's volunteers had limited availability and were not able to collect signatures on a full-time basis. (*Id.* at PageID.32 ¶ 21.) Peters Scott wanted to avoid hiring professional petition circulators, which come at a high cost and risks, but explored those services when she fell short of collecting the necessary signatures through volunteer efforts. (*Id.* at PageID.33 ¶¶ 25-26.) Peters Scott expended more than $60,000 in personal funds in connection with her campaign and petitioning efforts. (*Id.* ¶ 29.)

Peters Scott has collected approximately 7,230 "raw signatures" from voters across Michigan's 83 counties.[1] (*Id.* at PageID.32 ¶ 12.) She says that she secured

---

[1] When she submitted her materials to the Michigan Secretary of State on April 20, 2026, Peters Scott indicated in her "Affidavit of Identity" that she was submitting

4

over 100 signatures in each of the State's congressional districts.  (ECF No. 9 at

PageID.103.)

Candidates must collect more than the required signatures because some

signatures are likely to be invalidated due to technical requirements, such as voter

registration status, address discrepancies, and petition form compliance.  (ECF No.

3 at PageID.33 ¶¶ 23-24.)  In-person petitioning is more difficult during

Michigan's winter months due to the weather conditions and in the period

preceding "widespread public awareness of the election," when voter engagement

is reduced.  (*Id*. at PageID.32 ¶¶ 17-18.)  According to Peters Scott, the

simultaneous collection of signatures for statewide ballot proposals also hinders

candidates trying to satisfy Michigan's signature requirements because voters

decline to sign multiple petitions.  (*Id*. ¶¶ 19-20.)

### A.     Michigan's Ballot Requirements and Process

Under Michigan law, the filing requirements for a candidate seeking the

office of U.S. Senator vary depending on whether the person is a major or minor

party candidate or a candidate without political party affiliation.  *See* Mich. Comp.

Laws §§ 168.93, 168.590b, 168.590c.  The Michigan Department of State provides

---

11 boxes of petition sheets with approximately 9,000 signatures.  (ECF No. 8-2 at
PageID.96 ¶ 36.)

a summary of those requirements, which is publicly available on its website.  *See*

*https://perma.cc/Y4VL-3G72*.

"Candidates[,]" like Peters Scott, "seeking the Democratic Party or

Republican Party nomination must use the Countywide Partisan Nominating

Petition form[,]" "submit at least 15,000 valid signatures and may submit up to

30,000 signatures[,]" and "[t]he petition must be signed by at least 100 registered

electors in each of at least half of the congressional districts in the state."  *Id.*

(citing Mich. Comp. Laws §§ 168.93, 168.544f).  While the signatures of the

petitions of some candidates (e.g., candidates without political party affiliation)

must have been collected within the 180-days preceding the filing deadline, no

such limitation exists for major party candidates. [2]  *See id.*; (*see also* ECF No. 8-2

at PageID.94 ¶ 32.)

Peters Scott contends that the 180-day collection period applies to

candidates seeking the Democratic Party or Republican Party nomination—or at

least that the State has caused candidate confusion as to whether this requirement

applies—and she attaches the declaration of Anthony Hudson to her reply brief to

support this contention.  (*See* ECF No. 11-1.)  Hudson, a candidate for Michigan

---

[2] Non-party candidates have a narrow window to collect signatures but are required
to collect fewer signatures (12,000).  *See https://perma.cc/Y4VL-3G72* (citing
Mich. Comp. Laws §§ 168.590b(4), 168.544f.)

governor,[3] states that he was told over the telephone by an unidentified person at the Michigan Secretary of State that he had 180 days to collect the required signatures and that signatures collected before the 180-day window would not be considered valid.[4]  (ECF No. 11-1 at PageID.120 ¶¶ 4-5.)  Michigan law is clear, however, as to when the 180-day window for collecting signatures is imposed and when it is not.  *Compare* Mich. Comp. Laws § 168.590b(3) (setting forth the 180-day window for qualifying petitions under the chapter applying to "Candidates without Political Party Affiliation") *with* Mich. Comp. Laws § 168.93 (omitting such a window for the requirements applicable to candidates seeking nomination by a political party through the primary ballot).  The requirements are also clearly stated on the filing instructions provided by the Michigan Bureau of Elections, which is readily available on the Department of State's public website.[5]  *See*

*https://perma.cc/Y4VL-3G72*.

---

[3] Michigan's requirements to qualify as a candidate for governor are similar to those for U.S. Senate.  *See https://perma.cc/QTV2-6AX7*.

[4] It is unclear from Hudson's declaration whether he informed the individual that he was running as a major or minor party candidate or as a candidate without a party affiliation.  This detail would have been important.

[5] Contrary to Peters Scott's contention in her reply brief, the Bureau of Elections' instruction sheet does not state the 180-day period "as a general directive."  (*See* ECF No. 9 at PageID.101.)  Nor does the sheet fail to "clearly distinguish between candidate categories."  (*Id.*)  The instructions are clearly broken down into five sections, with the following bolded headings: (1) "General requirements"; (2) "Major party candidates"; (3) "Minor party candidates"; (4) "Candidates without

Signatures on a petition for a major party candidate may be obtained beginning the day after the office last appeared on the ballot.  (ECF No. 8-2 at PageID.94 ¶ 32.)  The United States Senate office on the ballot in 2026 last appeared on the ballot on November 3, 2020.  (*Id.*)  Thus, an individual seeking the Democratic Party or Republican Party nomination for U.S. Senate on the August 6, 2026 primary ballot could have started collecting signatures on November 4, 2020. (*Id.*)

As of April 16, 2026, three candidates for United States Senate had submitted petitions.  (*Id*. at PageID.95 ¶ 33.)  The deadline to submit a petition as a candidate seeking the Democratic Party or Republican Party nomination is 4 p.m. on the 15th Tuesday before the August Primary, which for the 2026 primary is April 21, 2026.  *See* https://perma.cc/Y4VL-3G72; *see also* Mich. Comp. Laws § 168.93.

The Bureau of Elections is responsible for accepting filing materials from candidates.  (ECF No. 8-2 at PageID.85 ¶ 2.)  It also canvasses nominating petitions and makes recommendations to the Board of State Canvassers regarding

---

political party affiliations"; and (5) "Write-in candidates[.]"  *See* *https://perma.cc/Y4VL-3G72*  The 180-day window for collecting signatures appears in only the "Candidates without political party affiliation" section.  *See id.* In her reply brief, Peters Scott asserts that the State's "[a]mbiguous and misleading guidance . . . imposes a cognizable burden and raises due process concerns."  (*Id.* at PageID.102.)  Finding no ambiguity or misguidance, the Court finds Peters Scott's due process challenge to be meritless.

whether each candidate required to submit nominating petitions has filed a sufficient number of valid signatures to qualify for office.  (*Id*. at PageID.86 ¶ 3.) There are various deadlines in the process, established by Michigan statute, so ballots can be timely printed before each election.  (*See generally id*.)

In 2024, the Bureau of Elections had to process nominating petitions filed by 120 candidates, collectively consisting of approximately 413,000 signatures.  (ECF No. 8-2 at PageID.88 ¶ 10.)  A multi-step process is in place for Bureau of Elections' staff to review nominating petitions and assess the validity of supporting signatures.  (*Id*. at PageID.88-94 ¶¶ 11-30.)  The Bureau of Elections uses a custom-designed computer program to randomly select signature sheets and signatures for the review process, and it makes the random sample available to the public for review and potential challenges.  (*Id*. at PageID.88 ¶¶ 12-14.)  The number of signatures used for the random sample is based on the applicable signature requirement.  (*See id*. ¶ 13; *see also id.* at PageID.95 ¶ 35.)

III.    **Applicable Law and Analysis**

Peters Scott maintains that Michigan's 15,000 signature requirement to qualify for inclusion on the Republican Party primary ballot for U.S. Senate, in combination with the rest of the statutory scheme—i.e., the purported 180-day window for collection, "early" filing deadline, geographic distribution requirement,

and lack of alternative qualifications—infringes her First and Fourteenth Amendment rights.[6]

The First Amendment protects the rights of citizens to associate and form political parties for the advancement of common political goals and ideas. *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 616 (1996). "The impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983). The exclusion of candidates from the ballot burdens "voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Id*. at 787-88. Further, "[v]oters, faced with statutorily limited ballot choices, may find exercise of the right to vote a Hobson's choice and not an expression of political preference." *Socialist Workers Party v. Sec'y of State*, 317 N.W.2d 1, 6 (Mich. 1982).

Nevertheless, the United States Constitution grants States the power to "prescribe 'the Times, Places and Manner of holding Elections for Senators and

---

[6] In her reply brief, Peters Scott also refers to the "limited lawful locations for signature collection, volunteer limitations, circulator risk, and post-submission challenges." (ECF No. 9 at PageID.105.) These "burdens" were not identified in her Complaint or initial brief in support of her motion, however. Defendants have not had the opportunity to address them. The Court, therefore, will not consider them for purposes of Peters Scott's motion.

Representatives,'" and "States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting U.S. Const. Art. I, § 4 cl. 1). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'" *Id*. at 433 (quoting *Stower v. Brown*, 415 U.S. 724, 730 (1974)).

To evaluate a constitutional challenge to a State's regulations, courts apply the framework set forth by the Supreme Court in *Anderson* and *Burdick*. *See Graveline v. Benson*, 992 F.3d 524, 534 (2021). Under this framework, courts "weigh 'the character and magnitude of the asserted injury' to [the plaintiff's] constitutional rights against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id*. (quoting *Anderson*, 460 U.S. at 789). "The appropriate balance is determined by the magnitude of the burden." *Id*.

"If the burden is severe, the regulation will be upheld only if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Id*. (quoting *Burdick*, 504 U.S. at 434). "If the regulations are minimally burdensome, the state's regulatory interests will likely justify 'reasonable, nondiscriminatory restrictions.'" *Id*. (quoting *Anderson*, 460 U.S. at 788). "[W]hen a state election

11

law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434. Such review is "quite deferential" and does not require "elaborate empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997). Where the regulations fall between these extremes and impose an "intermediate burden," "courts engage in a flexible analysis, weighing the burden on the plaintiff[] against the [S]tate's asserted interest and chosen means of pursuing it." *Graveline*, 992 F.3d at 535 (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)).

While the parties have not identified cases where courts consider the exact combination of requirements major party candidates for U.S. Senate must satisfy to be included on Michigan's August primary ballot, there are decisions which offer guidance in determining whether the scheme imposes severe burdens on Peters Scott's First and Fourteenth Amendment rights. As already discussed, the scheme does not in fact impose an 180-day collection period on major party candidates like Peters Scott. The Court turns to the remaining elements of Michigan's scheme which she challenges.

Peters Scott fails to show that these remaining elements place a severe or even intermediate burden on candidates. She claims to have satisfied the

12

geographical distribution requirement even within the non-existent 180-day collection window, and so the Court cannot find that requirement to be significantly burdensome. Peters Scott does not show or even explain why the April 21 filing deadline for major party candidates to be included on the August primary ballot is "early" or "burdensome." While courts have found some filing deadlines to be "early" and "burdensome," those cases usually address deadlines for minor political candidates and independent candidates when compared to the date of the primary election.[7]

Thus, we are left with the signature requirement, which Peters Scott only argues is unduly burdensome in the context of the non-existent 180-day collection window. In other words, while Peters Scott maintains that she could not collect the required signatures within the 180-day window, she fails to show that the threshold could not easily have been met if she had started collecting signatures when major party candidates were permitted to do so. In any event, precedent instructs that the signature requirement does not impose a severe or intermediate burden.

The United States Supreme Court and Sixth Circuit Court of Appeals have upheld signature requirements, concluding that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support

---

[7] *See Graveline v. Benson*, 992 F.3d 524, 536-37 (6th Cir. 2021) (collecting cases addressing filing deadlines for independent and minor-party candidates).

13

before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jennes v. Fortson*, 403 U.S. 431, 442 (1971); *see also Am. Party of Tex. v. White*, 415 U.S. 767, 783 (1974); *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016).  As the Sixth Circuit has expressed, signature requirements "ensure[] that a candidate has a modicum of support before appearing on the ballot in order to further the State's interest in a fair and orderly election by avoiding ballot overcrowding, frivolous candidates, and voter confusion." *Kishore v. Whitmer*, 972 F.3d 745, 751 (2020) (citing *Hawkins v. DeWine*, 968 F.3d 603, 606-07 (6th Cir. 2020); *Schmitt v. LaRose*, 933 F.3d 628, 641 (6th Cir. 2019)); *see also Libertarian Party of Ky.*, 835 F.3d at 577.

The Supreme Court and Sixth Circuit have upheld ballot-access laws requiring candidates to obtain signatures equal to one-percent (1%) of registered voters, finding those requirements to be reasonable and nondiscriminatory. *Am. Party of Tex.*, 415 U.S. at 783-84 (agreeing "that the required measure of support—1% of the vote for governor at the last general election and in this instance 22,000 signatures—falls within the outer boundaries of support the State may require before according political parties ballot position"); *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005) (holding that requirement for independent candidates to provide signatures equal to 1% of registered voters in the district was

14

justifiable).  The Supreme Court has upheld laws requiring signatures from as much as 5% of registered voters from a relevant geographic area.  *See, e.g., Jenness*, 403 U.S. 431, 438 (1974).  The Second Circuit Court of Appeals upheld a 5% signature requirement for a candidate to appear on the ballot for a major party primary ballot in *Gottlieb v. Lamont*, No. 22-449, 2023 WL 2879305 (Apr. 11, 2023).  The 15,000 signature requirement here is considerably less than 1% of the 5,479,720 votes cast for the same senate seat in 2020.

Thus, Peters Scott is unlikely to show that Michigan's "ballot access scheme" for U.S. Senate major political party candidates violates her First and Fourteenth Amendment rights.  Having reached this conclusion, the Court does not address Defendants' arguments that Peters Scott's claims are barred by laches or that her official capacity claims are barred by the Eleventh Amendment.  The Court also finds it unnecessary to extensively analyze the remaining factors for deciding whether injunctive relief is appropriate.

Nevertheless, the Court briefly addresses Peters Scott's contention that her exclusion from the primary ballot will cause her irreparable harm.  When a candidate is unconstitutionally deprived of access to the ballot, irreparable harm can be presumed.  *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (2014) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) ("[I]t is well-settled that loss of First Amendment freedoms, even for minimal periods of time, unquestionably

15

constitutes irreparable injury").  However, Peters Scott has not satisfied Michigan's ballot-access requirements, which the Court finds are constitutional.  If the Court found that she would suffer irreparable harm if not included on the primary ballot, it would have to find harm to any individual seeking to be included on the ballot, regardless of whether they have shown even a modicum of support among potential voters for the office.

The State and public will suffer harm if any individual seeking to be included on the primary ballot must be included regardless of their showing of sufficient voter support.  Allowing candidates with minimal support to enter the fray will place an administrative burden on the State and interfere with its ability to protect the integrity of the election process and meet its statutory deadlines.  It also poses a risk of undue voter confusion and frustration of the democratic process.

Moreover, the State and public have a legitimate interest in the enforcement of constitutional ballot-access requirements.  *See Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (quoting *Conn. Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)) (ellipsis removed) (finding that "in First Amendment cases, 'the determination of where the public interest lies is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge,' because if the regulation in question is likely to be deemed constitutional, the public interest will not be harmed by its enforcement").  "Unless the statute is

16

unconstitutional, enjoining a State from conducting its elections pursuant to a statute enacted by the Legislature would seriously and irreparably harm the State." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (cleaned up). "It's in the public interest that [courts] give effect to the will of the people 'by enforcing the laws they and their representatives enact." *Id*. (citation omitted).

## IV.    Conclusion

Balancing the relevant factors, the Court concludes that Peters Scott is not entitled to injunctive relief.  The Court declines Peters Scott's request to order Defendants to include her name on the August 6 Republican Party primary ballot for U.S. Senate.  Nor will the Court mandate a reduction in the number of signatures required for a major party candidate to qualify for the primary ballot or a filing-fee alternative.

Accordingly,

**IT IS ORDERED** that Peters Scott's motion for a TRO and preliminary injunction (ECF No. 3) is **DENIED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: April 27, 2026

17

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, April 27, 2026, by electronic and/or U.S. First Class mail.

s/Aaron Flanigan
Case Manager

18